## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DEBORAH STREETER et al.   *
                          *
          v.              *     Civil Action WMN-09-CV-01022
                          *
SSOE SYSTEMS et al.       *

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Before the Court is Defendants SSOE Systems, Inc.; SSOE, Inc.; Cianbro Corporation; Cianbro Equipment, LLC; Cianbro Fabrication and Coating Corporation; Warrant Environment, Inc.; and Engineered Crane Systems of America's Motion for Summary Judgment. Paper No. 62. The motion is fully briefed. Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that the Motion will be granted as set forth below.

**I.   BACKGROUND**

This action arises out of the death of Jimmy Wayne Streeter on March 14, 2006. Mr. Streeter died when the maintenance truck in which he was sitting was struck by a 64-foot-long portion of a calciner start-up stack that broke off of the roof of the W.R. Grace FCC plant in Curtis Bay, Maryland. Mr. Streeter's widow and son allege that the Defendants negligently designed, manufactured, and erected the stack. Defendants assert in their

1

motion that Plaintiffs' claims are barred by the Maryland statue of repose.

W.R. Grace owns a facility in Curtis Bay, Maryland, which, in 1994, had a plant that created ingredients to make fluid cracking catalyst ("FCC"). FCC is used by refineries to break the molecular chains of crude oil so they can produce more gasoline. The FCC ingredients would be shipped from the Curtis Bay facility to other facilities owned by W.R. Grace to manufacture the completed FCC product. Sometime prior to 1995, W.R. Grace decided to build a new FCC plant (Plant) at Curtis Bay to manufacture the completed product without the need to ship the ingredients to other facilities. The initial plan was to construct a new FCC plant that would manufacture silica sol but that could be retrofitted to manufacture other fluid cracking catalysts, alumina sol (DA) and/or XP products. Construction of the new FCC plant was approved by the W.R. Grace Board of Directors in March 1994 with design and permitting for the new plant also occurring in 1994.

The new FCC plant includes a "calciner start-up stack" (Stack), which allows hot gas to escape from the calciner during start-up. The stack is integrated into the new FCC plant and passes through the roof of the building. SSOE, Inc., Cianbro Corporation, Warrant Environment, Inc., and Engineered Crane

Systems of America were involved in the design construction, and installation of the new FCC plant, including the Stack.

Construction of the new FCC plant, including the calciner start-up stack, was completed in November 1995. Following the completion of construction, W.R. Grace "loop-checked" all of the equipment and instrumentation to ensure that they were functional. Following the "loop-check," W.R. Grace ran tests on some of the equipment including firing up the calciner and heating up the Stack to confirm that they were operating correctly. Heat was first applied to the Stack sometime in December 1995. The first ten-ton production of silica sol was produced on December 31, 1995. Equipment "shake-out," in which various mechanical difficulties were resolved, continued until April 2, 1996. W.R. Grace continued to produce silica sol during that time, however, and was able to send its first shipment to a customer in March 1996. As of April 2, 1996, the new FCC plant was producing approximately 60% of its intended capacity for production of silica sol. Stack compliance testing took place in August 1996, which required that the plant be operating at a minimum of 90% capacity.

In June 1995, due to changes in market conditions, W.R. Grace decided to expand the capacity of the new FCC plant to manufacture alumina sol (DA conversion project). Work on the DA

3

conversion project started sometime in early 1996 and was completed in June 1996.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits, or other documentation which demonstrates that a triable issue of fact exists for trial. Celotex, 477 U.S. at 324. Unsupported

speculation is insufficient to defeat a motion for summary judgment. Felty, 818 F.2d at 1128 (citing Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986)). Furthermore, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material." Id.

## III. DISCUSSION

Maryland's ten-year statute of repose for architects, engineers, and contractors provides as follows:

> Except as provided by this section, a cause of action for damages does not accrue and a person may not seek contribution or indemnity from any architect, professional engineer, or contractor for damages incurred when wrongful death, personal injury, or injury to real or personal property, resulting from the defective and unsafe condition of an improvement to real property, occurs more than 10 years after the date the entire improvement first became available for its intended use.

Md. Code Ann., Cts & Jud. Proc. §5-108(b).[1] The purpose of the statute of repose, is to extinguish the prospect of liability and "protect [those] in the construction industry from being hauled into court by reason of latent defects that did not

---

[1] The Parties do not dispute that Maryland law governs this case. See Harvard v. Perdue Farms, Inc., 403 F. Supp. 2d 462, 466 (D. Md. 2005).

5

become manifest until years after completion of the construction." Hagerstown Elderly Assocs. Ltd. P'ship v. Hagerstown Elderly Bldg. Assocs. Ltd. P'ship, 793 A.2d 579, 585-86 (Md. 2002).

Plaintiffs concede that the start-up calciner stack was an improvement under section 5-108(b) and that all Defendants but Cianbro Corporation fall under the protections of section 5-108(b) as either architects, engineers, or contractors. They argue, however, that because Defendants relied in their motion on an interrogatory answer and not on admissible evidence to establish that Cianbro Corporation is entitled to immunity under Section 5-108(b) the Court cannot grant summary judgment as to Cianbro Corporation. In response, Defendants point out that Plaintiffs themselves have alleged that Cianbro Corporation was involved in the design, construction, and installation of the new FCC plant, including the start-up stack. They also attached evidence of a purchase order issued to Cianbro Corporation and an affidavit that the work performed by Cianbro pursuant to that purchase order included the installation of the stack. Mawhinney Aff. ¶ 2. Finally, two corporate designees for W.R. Grace, Art Sorak and Steven DeRouen, testified that Cianbro Corporation was the contractor for the installation of the stack. Sorak Dep. at 31:19-32:18 (Jan. 28, 2010); DeRouen Depo. At 21:10-21 (Feb. 4, 2010). Thus, Defendants have sufficiently

demonstrated that Cianbro Corporation was a contractor subject to the immunity provided under section 5-108(b).

Plaintiff argues, however, that it has not been ten years since the date the entire new FCC plant first became available for its intended use.  Should the Court find otherwise, Plaintiff contends that the statute of repose is a violation of Article 19 of the Maryland Bill of Rights as to the minor Plaintiff and should be tolled as to him.  The Court disagrees with both arguments and finds that Plaintiffs' action is barred by § 5-108(b).[2]

## A. The Date The Entire FCC Plant First Became Available For Its Intended Use

The primary dispute as to whether Defendants are immune from potential liability under section 5-108(b) revolves around "the date that the entire [FCC Plant] first became available for

---

[2] Plaintiffs additionally argue that Summary Judgment is inappropriate because discovery has not yet concluded.  Federal Rule of Civil Procedure 56(f) requires that if a party opposing the motion for summary judgment wants a court to order a continuance in order to obtain more discovery, it must show specific reasons by affidavit as to why it cannot present facts essential to justify its opposition.  Plaintiffs have provided no such affidavit nor provided any explanation as to what additional information it might find with further discovery that would alter the Court's decision.  Thus, the Court will not order a continuance to complete discovery.  See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 961 (4th Cir. 1996) ("We, like other reviewing courts, place great weight on the Rule 56(f) affidavit, believing that '[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit.'").

its intended use." Defendants contend that this date was, at the latest, December 31, 1995, when the new FCC plant produced its first fluid cracking catalyst, silica sol. Plaintiffs argue that the <u>entire</u> FCC Plant was not available for its <u>intended</u> use until June 1996 when construction on both the silica sol and alumina sol (DA) processes was completed and the plant was capable of producing the two compounds.

In response to Plaintiffs' argument, Defendants counter that the objective of the construction of the new FCC Plant, including the calciner start-up stack, was to manufacture silica sol; the addition of the alumina sol (DA) catalyst production equipment to the new FCC Plant was a second, independent capital improvement program. Defendants contend that the addition of the DA production process simply added new processing equipment within the new FCC plant in order to produce a different product and did not structurally alter or in any way modify the stack. Thus, Defendants argue that once the new FCC plant was capable of producing silica sol, it became first available for its intended use.

Defendants further argue that should the Court follow Plaintiffs' theory, the ten year period of the statute of repose would reset anytime a manufacturing plant or other facility is upgraded or improved. According to Defendants, the fact that the upgrade to manufacture alumina sol (DA) took place while

they were working out bugs on the silica sol process should not make it any different than had the upgrade taken place years later, particularly since the upgrade did not modify the stack and the stack was already in use for the ongoing silica sol production.

In support of their argument, Defendants cite to <u>Hartford Insurance Company of the Midwest v. American Automatic Sprinkler Systems, Inc.</u>, 201 F.3d 538 (4th Cir. 2000). In <u>Hartford</u>, a contractor installed a sprinkler system in a hotel in 1982 when the hotel was originally constructed. <u>Id.</u> at 540. The sprinkler system was renovated in 1996 as part of a hotel upgrade. <u>Id.</u> Shortly thereafter, a cap and coupling on the standpipe portion of the sprinkler system broke causing extensive damage to the hotel. <u>Id.</u> at 539. The Fourth Circuit noted, however, the renovations did not involve work on the standpipe risers . . . and did not require employees to work in the stairwells where the standpipe risers were located. <u>Id.</u> at 543. Moreover, the Court found that the plaintiff had not proven that the 1996 renovations done on other parts of the system caused the damage to the standpipe portion of the system. <u>Id.</u> Thus, the Court ruled that the contractor was immune from suit as to claims relating to the 1982 installation of the sprinkler system because the 1996 incident was more than ten years after the entire hotel, including the sprinkler system,

9

first became available for its intended use.  Id.  Defendants argue that the situation here is no different: the new FCC plant was built and completed with the initial silica sol process first operating in December 1995 and the separate DA conversion process started in 1996 and completed in June 1996.

This Court agrees with Defendants analysis.  The evidence demonstrates the separateness of adding the alumina sol (DA) process from the construction of the new FCC Plant and initial silica sol process.  Project authorization for the new FCC plant project was obtained in March 1994.  It was originally designed and contracted to manufacture the family of products known as silica sol and have the capability of being retrofitted for alumina sol (DA) and/or XP products in the future.  The Baltimore Department of Housing and Community Development issued the building permit for the FCC Plant on July 11, 1994, and the Maryland Department of the Environment issued its construction permit on August 11, 1994.  W.R. Grace issued a purchase order to Cianbro Corporation for mechanical work for the Plant on March 9, 1995.  Construction of the new FCC plant was completed in November 1995 and the temporary operating permit was issued by the Maryland Department of the Environment on December 8, 1995.

In contrast, the purchase order to Riggs Distler & Co., a different contractor than for the original silica sol process,

10

for mechanical work for the DA conversion project was issued on December 7, 1995, after the completion of the construction of the new FCC Plant. The Baltimore Department of Housing and Community Development issued a separate building permit for the addition of the DA process on January 31, 1996, after the first silica sol had already been produced. The Maryland Department of the Environment issued its construction permit for the addition on March 11, 1996. Construction of the DA conversion was then completed in June 1996.

The separateness of the two projects is highlighted in a letter from W.R. Grace to the Maryland Department of the Environment dated November 9, 1995, updating the status of the new FCC plant construction, and applying for a construction permit to add the capability to produce alumina sol (DA).

> Construction of the FCC plant has gone well and we expect start-up in early December. We estimate that the startup period will take approximately four months. We will then do stack testing. The target date for sending the stack test reports to you is the first week of April 1996. . . . Our new plant is designed to produce and will start up on the Silica Sol family of FCC's. Due to market demand, <u>after the startup phase is complete</u>, we want to produce a modified grade of catalyst called AC Wash DA."

Defs.' Reply, Ex. 9 (emphasis added). Thus, the "entire improvement" and "intended use" for the purposes of Plaintiffs claims consisted of the construction of the new FCC Plant to produce silica sol.

11

The remaining question is when the new FCC plant became first available for its intended use. In Rose v. Fox Pool Corp., the Maryland Court of Appeals held that "construction or installation of the entire improvement need not be totally completed for the entire improvement to be considered 'first . . . available for its intended use.'"[3] 643 A.2d 906, 919 (Md. 1994). Rather, the court interpreted the phrase as meaning "the entire improvement must only be substantially completed or completed to such a degree that it is capable of being used in its intended manner." Id. The Rose court did not actually apply the definition to the facts, however.

The only Maryland case which provides any description as to the determination of the date upon which an improvement first became available for its intended use is Hagerstown Elderly Association Ltd. v. Hagerstown Elderly Building Association, 793 A.2d 579 (Md. 2002). In Hagerstown, the parties disputed whether § 5-108(b) would bar a breach of contract claim following the collapse of a portion of an exterior wall of an eleven-story building. Id. at 580. The city had conducted a

---

[3] The Rose court was interpreting language in section 5-108(a) rather than (b). The Maryland Court of Appeals has noted, however, that "subsections (a) and (b) [of section 5-108] are almost identically worded in substance, the only significant difference between them being that, with respect to architects, professional engineers and contractors, the action must be brought within ten, rather than twenty, years." Hagerstown Elderly Assoc. Ltd. v. Hagerstown Elderly Bldg. Assoc., 793 A.2d 579, 584 (2002).

final inspection and issued a Use and Occupancy Permit for the building on December 16, 1983. Id. at 581. The defendant and the architect filed a Certificate of Substantial Completion on December 21, 1983. Id. The plaintiff granted permission for the occupancy of all 110 units of the project that same day although a punch list of final items to be corrected or completed remained and a part of the final payment was placed in escrow. Id. All of the final items were completed on February 28, 1984. Id. The court stated, without discussion, that "the entire improvement – the building – first became available for its intended use in December, 1983, when the City of Hagerstown's final inspection was completed, a certificate of occupancy was issued, CDA's permission to occupy all units was issued, and the first occupancy by a tenant occurred." Id. at 583-84.

The Hagerstown decision is instructive here in that the court considered the building to be "first available for its intended use" once the plaintiff was able to occupy the units (which required an inspection and a certificate of occupancy to be issued) even though some final work remained to be done on the building. Here, W.R. Grace received a temporary operating permit from the Maryland Department of the Environment on December 8, 1995, and was able to produce the first silica sol on December 31, 1995. Moreover, Cianbro Corporation sent its

13

final invoice to W.R. Grace for the work it performed on the new FCC plant on December 4, 1995, indicating its understanding of substantial completion as of that date. Although problems remained to be fixed until April 2, 1996, the factory continued to produce silica sol during that period and began shipping to its customers in March 1996. Thus, based on Hagerstown, the date the new FCC plant first became available for its intended use was December 31, 1995, when it first started producing silica sol. Because the accident did not occur until March 14, 2006, more than ten years following the Plant becoming first available for its intended use, Plaintiffs claims are barred by §5-108(b).

**B.  Tolling of Statute of Repose For Minor Plaintiff**

Plaintiffs' final argument is that § 5-108(b) should be tolled as to the minor Plaintiff. Plaintiffs base their argument on the Maryland Court of Appeal's holding in Piselli v. 75th Street Medical, 808 A.2d 508 (Md. 2002), that, under Article 19 of the Maryland Declaration of Rights, the statute of limitations contained in § 5-109(a) of the Maryland Courts and Judicial Proceedings Article must be tolled as to minors until they reach 18 years of age.

Article 19 "generally prohibits unreasonable restrictions upon traditional remedies or access to the courts but allows the Legislature, pursuant to its authority to change the common law

14

or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts." Id. at 518 (internal citations omitted). Section 5-109(a) requires that "an action for damages for an injury arising out of the rendering or failure to render professional services by a health care provider . . . shall be filed within" five years of when the injury occurs or three years from the discovery of the injury. Subsection (b) of § 5-109 tolls the limitations under subsection (a) for minors until the age of 11 or 16 depending on the nature of the injury. The Piselli court held that these time restrictions "as applied to an injured minor's claim, are unreasonable restrictions upon a traditional remedy and the minor's access to the courts." 808 A.2d at 524.

The court reached the conclusion that such restrictions were unreasonable because they would potentially leave a child at the mercy of his/her parents or guardian to bring an accrued claim since "a child is disabled from bringing a tort action until he or she is 18 years old." Id. If a parent's failure to bring an accrued claim before the expiration of limitations resulted in a barring of that child's claim "the child would be twice victimized-once at the hands of the tortfeasor, and once by parents who, for whatever reason, failed to timely prosecute [the] claims," Id. (quoting John Hopkins Hospital v. Pepper, 697 A.2d 1358, 1366 (Md. 1997)). Such a result "'would leave the

15

only innocent victim in such a transaction uncompensated for his or her injuries,'" which would be "contrary to '[p]ublic policy and justice.'" Id. (quoting Pepper, 697 A.2d at 1366). Thus, the court concluded that "barring an injured child's medical malpractice claim before the child is able to bring an action is an unreasonable restriction upon the child's right to a remedy and access to the courts guaranteed by Article 19 of the Maryland Declaration of Rights." Id.

The same rationale does not counsel in favor of tolling § 5-108(b), however. § 5-109 is a statute of limitation[4] and invoked after an injury has already occurred and a claim accrued and sets a limit on how long a plaintiff has to seek a legal remedy for that claim. The time limitation set for filing a claim in § 5-109 is simply "a procedural device that operates as a defense to limit the remedy available from an existing cause

---

[4] Plaintiffs' contend that § 5-109 is a statute of repose. As discussed in the body of this memorandum, the difference between a statute of limitations and statue of repose is that in the former, a cause of action has already accrued and a limitation is placed on the time an injured individual has to file a claim, and in the latter, a limitation is placed on the time in which an action may accrue should an injury occur in the future. See First United Methodist Church of Hyattsville, 882 F.2d at 865-66. The difference between § 5-108(b) and § 5-109 is highlighted by § 5-108(c), which provides a limitation of three years to file a claim that accrues within the time period under § 5-108(b). Subsection (c) is, therefore, a statute of limitation placed on any claim not barred by § 5-108(b). Thus, because § 5-109 is invoked after an injury has already taken place and an action accrued, the limitation on filing a claim makes § 5-109 a statute of limitation rather than a statute of repose.

16

of action." See First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 865 (4th Cir. 1989). The limitation is "motivated by considerations of fairness to defendants and [is] intended to encourage prompt resolution of disputes by providing a simple procedural mechanism to dispose of stale claims." Id. at 866. Section 5-108(b), on the other hand, is a statute of repose and used to determine if a claim is able to accrue. The limitation is on how long an architect, engineer, or contractor must continue to potentially face liability for improvements to real property if an injury occurs in the future. It, thus, "creates a substantive right in those protected to be free from liability after a legislatively-determined period of time." Id. This kind of limitation is "based on considerations of the economic best interests of the public as a whole and [is a] substantive grant[] of immunity based on a legislative balance of the respective rights of potential plaintiffs and defendants struck by determining a time limit beyond which liability no longer exists." Id.

Because § 5-108 is used to determine whether a claim accrues and not whether an accrued claim may be pursued, the same reasoning for tolling the limitations of § 5-109 does not exist. Unlike in Piselli, § 5-108(b) does not put the onus of bringing a child's claim on a parent or guardian or forever losing the ability to bring a claim. Rather, if a child or an

17

adult is not injured within the ten year period following completion of construction, then no claim accrues and neither child nor adult have a claim.

Moreover, public policy considerations counsel against tolling § 5-108.  Id.  As explained by the Fourth Circuit

> [the statute is] a response to the problems arising from the expansion of liability based on the defective and unsafe condition of an improvement to real property. . . . If a legislative body concludes that it will address the problem of expanded liability . . . it must balance the interests of those potentially subject to liability, of those directly suffering injury, and of the public in having improvements built safely and at a reasonable cost.

Id.  Thus, unlike § 5-109, a statute of limitation, which may be tolled in order to prevent injustice, "a statute of repose is typically . . . not tolled for any reason because to do so would upset the economic balance struck by the legislative body."  Id. Were the Court to toll the ten year limitation of § 5-108(b) as Plaintiffs propose, it would essentially annul the carefully balanced legislation, leaving open the possibility that a claim would accrue into perpetuity if a child was injured by an improvement to real property.

The remaining question then is whether § 5-108 is a reasonable restriction upon a traditional remedy or access to the courts or is a violation of Article 19 of the Maryland Declaration of Rights.  The Maryland Court of Appeals in Whiting-Turner Contracting Co. v. Coupard, 499 A.2d 178, 183-89

(Md. 1985) has determined that § 5-108 is reasonable as to adults, and the reasoning of that opinion applies equally here to a minor. Therefore, this Court holds that § 5-108(b) is not to be tolled for the minor Plaintiff.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted. A separate order will issue.

August 11, 2010 _____/s/_____
William M. Nickerson
Senior United States District Judge